# CHARLES D. BONANNO LINEN SERVICE, INC. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 80–931.   Argued October 13, 1981—Decided January 12, 1982

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 419. BURGER, C. J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 420. O'CONNOR, J., filed a dissenting opinion, in which POWELL, J., joined, *post*, p. 427.

*Sidney A. Coven* argued the cause and filed a brief for petitioner.

*Norton J. Come* argued the cause for respondent National Labor Relations Board. With him on the brief were *Acting Solicitor General Wallace, Harriet S. Shapiro, Linda Sher,* and *John H. Ferguson. James T. Grady* argued the cause and filed a brief for respondent Teamsters Local Union No. 25.*

JUSTICE WHITE delivered the opinion of the Court.

The issue here is whether a bargaining impasse justifies an employer's unilateral withdrawal from a multiemployer bargaining unit. The National Labor Relations Board (Board) concluded that an employer attempting such a withdrawal commits an unfair labor practice in violation of §§ 8(a)(5) and 8(a)(1) of the National Labor Relations Act (Act), 29 U. S. C. §§ 158(a)(5) and 158(a)(1), by refusing to execute the collective-bargaining agreement later executed by the union and the multiemployer association.[1] The Court of Appeals for the First Circuit enforced the Board's order. 630 F. 2d 25

---

*Lawrence T. Zimmerman* and *Steven R. Semler* filed a brief for Graphic Arts Union Employers of America as *amicus curiae* urging reversal.

Briefs of *amici curiae* were filed by *Ralph B. Hoyt* for Golden Bear Motors, Inc.; and by *Harrison Combs* for United Mine Workers of America.

[1] Section 8(d) of the Act, 61 Stat. 142, 29 U. S. C. § 158(d), states, in relevant part:

"[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, . . . and the execution of a written contract incorporating any agreement

(1980). Both the Board and the Court of Appeals recognized that several other Courts of Appeals had previously rejected the Board's position on this issue.[2] We granted certiorari, 450 U. S. 979 (1981), to resolve the conflict among the Circuits on this important question of federal labor law. We affirm the judgment of the Court of Appeals.

I

The factual findings of the Administrative Law Judge were affirmed by the Board and are undisputed. Petitioner, Charles D. Bonanno Linen Service, Inc. (Bonanno), is a Massachusetts corporation engaged in laundering, renting, and distributing linens and uniforms. Teamsters Local No. 25 (Union) represents its drivers and helpers as well as those of other linen supply companies in the area. For several

---

reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . ."

Section 8(a)(5) of the Act, 61 Stat. 141, 29 U. S. C. § 158(a)(5), declares it an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)." Section 8(b)(3), 61 Stat. 141, 29 U. S. C. § 158(b)(3), declares it an unfair labor practice for a labor organization "to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a)." Section 9(a), 61 Stat. 143, 29 U. S. C. § 159(a), in turn, specifies that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining . . . ." Finally under § 2(2), 61 Stat. 137, 29 U. S. C. § 152(2), the term "employer" includes "any person acting as an agent of an employer, directly or indirectly," and the term "person" is defined in § 2(1), 61 Stat. 137, 29 U. S. C. § 152(1), to include "associations."

[2] See *NLRB* v. *Independent Assn. of Steel Fabricators, Inc.*, 582 F. 2d 135 (CA2 1978), cert. denied, 439 U. S. 1130 (1979); *NLRB* v. *Beck Engraving Co., Inc.*, 522 F. 2d 475 (CA3 1975); *NLRB* v. *Associated Shower Door Co., Inc.*, 512 F. 2d 230 (CA9), cert. denied, 423 U. S. 893 (1975); *NLRB* v. *Hi-Way Billboards, Inc.*, 500 F. 2d 181 (CA5 1974); *Fairmont Foods Co.* v. *NLRB*, 471 F. 2d 1170 (CA8 1972).

years, Bonanno has been a member of the New England Linen Supply Association (Association), a group of 10 employers formed to negotiate with the Union as a multiemployer unit and a signatory of the contracts negotiated between the Union and the Association. On February 19, 1975, Bonanno authorized the Association's negotiating committee to represent it in the anticipated negotiations for a new contract. Bonanno's president became a member of the committee.

The Union and the Association held 10 bargaining sessions during March and April. On April 30, the negotiators agreed upon a proposed contract, but four days later the Union members rejected it. By May 15, according to the stipulations of the parties, the Union and the Association had reached an impasse over the method of compensation: the Union demanded that the drivers be paid on commission, while the Association insisted on continuing payment at an hourly rate.

Several subsequent meetings failed to break the impasse. On June 23, the Union initiated a selective strike against Bonanno. In response, most of Association members locked out their drivers. Despite sporadic meetings, the stalemate continued throughout the summer. During this period two of the employers met secretly with the Union, presumably in an effort to reach a separate settlement. These meetings, however, never reached the level of negotiations.

Bonanno hired permanent replacements for all of its striking drivers. On November 21, it notified the Assocation by letter that it was "withdrawing from the Association with specific respect to negotiations at this time because of an ongoing impasse with Teamsters Local 25." Pet. for Cert. 58. Bonanno mailed a copy of its revocation letter to the Union and read the letter over the phone to a Union representative.

Soon after Bonanno's putative withdrawal, the Association ended the lockout. It told the Union that it wished to continue multiemployer negotiations. Several negotiating ses-

sions took place between December and April, without Bonanno participating. In the middle of April, the Union abandoned its demand for payment on commission and accepted the Association's offer of a revised hourly wage rate. With this development, the parties quickly agreed on a new contract, dated April 23, 1976, and given retroactive effect to April 18, 1975.

Meanwhile, on April 9, 1976, the Union had filed the present action, alleging that Bonanno's purported withdrawal from the bargaining unit constituted an unfair labor practice. In a letter dated April 29, the Union informed Bonanno that because the Union had never consented to the withdrawal, it considered Bonanno to be bound by the settlement just reached. In a reply letter, Bonanno denied that it was bound by the contract.

An Administrative Law Judge concluded, after a hearing, that no unusual circumstances excused Bonanno's withdrawal from the multiemployer bargaining unit. The Board affirmed, ordering Bonanno to sign and implement the contract retroactively. In a supplemental decision, the Board explained the basis of its decision that Bonanno's attempt to withdraw from the multiemployer unit was untimely and ineffective. *Charles D. Bonanno Linen Service, Inc.*, 243 N. L. R. B. 1093 (1979). The Court of Appeals enforced the Board's order. 630 F. 2d 25 (1980).

## II

The standard for judicial review of the Board's decision in this case was established by *NLRB* v. *Truck Drivers*, 353 U. S. 87 (1957) *(Buffalo Linen)*. There, the Union struck a single employer during negotiations with a multiemployer bargaining association. The other employers responded with a lockout. Negotiations continued, and an agreement was reached. The Union, claiming that the lockout violated its rights under §§ 7 and 8 of the Act, then filed charges with the Board. The Board rejected the claim, but the Court of Appeals held that the lockout was an unfair practice.

This Court in turn reversed. That the Act did not expressly authorize or deal with multiemployer units or with lockouts in that context was recognized. Nonetheless, multiemployer bargaining had "long antedated the Wagner Act" and had become more common as employers, in the course of complying with their duty to bargain under the Act, "sought through group bargaining to match increased union strength." 353 U. S., at 94–95 (footnote omitted). Furthermore, at the time of the debates on the Taft-Hartley amendments, Congress had rejected a proposal to limit or outlaw multiemployer bargaining. The debates and their results offered "cogent evidence that in many industries multiemployer bargaining basis was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining." *Id.*, at 95.[3] Congress' refusal to intervene indicated that it intended to leave to the Board's specialized judgment the resolution of conflicts between union and employer rights that were bound to arise in multiemployer bargaining. In such situations, the Court said:

"The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that bal-

---

[3] As the Court of Appeals explained in this case:

"Multiemployer bargaining offers advantages to both management and labor. It enables smaller employers to bargain 'on an equal basis with a large union' and avoid 'the competitive disadvantages resulting from non-uniform contractual terms.' *NLRB* v. *Truck Drivers Local 449*, 353 U. S. 87, 96 . . . (1957). At the same time, it facilitates the development of industry-wide, worker benefit programs that employers otherwise might be unable to provide. More generally, multiemployer bargaining encourages both sides to adopt a flexible attitude during negotiations; as the Board explains, employers can make concessions 'without fear that other employers will refuse to make similar concessions to achieve a competitive advantage,' and a union can act similarly 'without fear that the employees will be dissatisfied at not receiving the same benefits which the union might win from other employers.' *Brief*, at 10. Finally, by permitting the union

ance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *Id.*, at 96.

Thus, the Court of Appeals' rejection of the Board's justification of the lockout as an acceptable effort to maintain the integrity of the multiemployer unit and its refusal to accept the lockout as a legitimate response to the whipsaw strike had too narrowly confined the exercise of the Board's discretion. *Id.*, at 97.

Multiemployer bargaining has continued to be the preferred bargaining mechanism in many industries,[4] and as *Buffalo Linen* predicted, it has raised a variety of problems requiring resolution. One critical question concerns the rights of the union and the employers to terminate the multiemployer bargaining arrangement. Until 1958, the Board permitted both employers and the union to abandon the unit even in the midst of bargaining. *Bearing & Rim Supply Co.*, 107 N. L. R. B. 101, 102–103 (1953); *Stamford Wall Paper*, 92 N. L. R. B. 1173 (1951); *Morand Bros. Beverage Co.*, 91 N. L. R. B. 409, 413, 416–418 (1950), enf'd in part on other grounds, 190 F. 2d 576, 581–582 (CA7 1951). But in *Retail Associates, Inc.*, 120 N. L. R. B. 388 (1958), the Board announced guidelines for withdrawal from multiemployer units. These rules, which reflect an increasing emphasis on the stability of multiemployer units, permit any party to withdraw

and employers to concentrate their bargaining resources on the negotiation of a single contract, multiemployer bargaining enhances the efficiency and effectiveness of the collective bargaining process and thereby reduces industrial strife." 630 F. 2d, at 28.

[4] A recent survey of major collective-bargaining agreements (those covering 1,000 or more employees) found that of 1,536 major agreements, 648 (42%) were multiemployer agreements and that 3,238,400 employees were covered by these agreements. U. S. Bureau of Labor Statistics, Dept. of Labor, Bull. No. 2065, Characteristics of Major Collective Bargaining Agreements—January 1, 1978, p. 12, table 1.8 (1980).

prior to the date set for negotiation of a new contract or the date on which negotiations actually begin, provided that adequate notice is given. Once negotiations for a new contract have commenced, however, withdrawal is permitted only if there is "mutual consent" or "unusual circumstances" exist. *Id.*, at 395.

The Board's approach in *Retail Associates* has been accepted in the courts,[5] as have its decisions that unusual circumstances will be found where an employer is subject to extreme financial pressures or where a bargaining unit has become substantially fragmented.[6] But as yet there is no consensus as to whether an impasse in bargaining in a multi-employer unit is an unusual circumstance justifying unilateral withdrawal by the Union or by an employer. After equivocating for a time, the Board squarely held that an impasse is not such an unusual circumstance. *Hi-Way Billboards, Inc.*, 206 N. L. R. B. 22 (1973). The Court of Appeals for the Fifth Circuit refused enforcement of that decision, 500 F. 2d 181 (1974), although it has since modified its views and now supports the Board.[7] Similar decisions by the Board were also overturned by the Courts of Appeals in three other Cir-

---

[5] See, *e. g.*, *NLRB* v. *Custom Wood Specialties, Inc.*, 622 F. 2d 381 (CA8 1980); *Carvel Co.* v. *NLRB*, 560 F. 2d 1030 (CA1 1977), cert. denied, 434 U. S. 1065 (1978); *NLRB* v. *Central Plumbing Co.*, 492 F. 2d 1252 (CA6 1974); *NLRB* v. *Brotherhood of Teamsters, Local No. 70*, 470 F. 2d 509 (CA9 1972), cert. denied, 414 U. S. 821 (1973); *NLRB* v. *Johnson Sheet Metal, Inc.*, 442 F. 2d 1056 (CA10 1971); *NLRB* v. *Dover Tavern Owners' Assn.*, 412 F. 2d 725 (CA3 1969); *NLRB* v. *John J. Corbett Press, Inc.*, 401 F. 2d 673 (CA2 1968).

[6] See, *e. g.*, *NLRB* v. *Southwestern Colorado Contractors Assn.*, 447 F. 2d 968 (CA10 1971); *NLRB* v. *Spun-Jee Corp.*, 385 F. 2d 379 (CA2 1967); *Connell Typesetting Co.*, 212 N. L. R. B. 918 (1974); *Atlas Electrical Service Co.*, 176 N. L. R. B. 827 (1969); *U. S. Lingerie Corp.*, 170 N. L. R. B. 750 (1968).

[7] In *NLRB* v. *Marine Machine Works, Inc.*, 635 F. 2d 522 (CA5 1981), it was concluded that the Board's policy wisely and properly weighed the competing policy concerns.

cuits. *NLRB* v. *Beck Engraving Co.*, 522 F. 2d 475 (CA3 1975); *NLRB* v. *Independent Assn. of Steel Fabricators*, 582 F. 2d 135 (CA2 1978); *H. & D., Inc.* v. *NLRB*, 665 F. 2d 257, 105 LRRM 3070 (CA9 1980), cert. pending, No. 80–1498. After again considering the question in this case, the Board issued its decision reaffirming its position that an impasse is not an unusual circumstance justifying withdrawal. Its decision was sustained and enforced by the Court of Appeals for the First Circuit.

### III

We agree with the Board and with the Court of Appeals. The Board has recognized the voluntary nature of multiemployer bargaining. It neither forces employers into multiemployer units nor erects barriers to withdrawal prior to bargaining. At the same time, it has sought to further the utility of multiemployer bargaining as an instrument of labor peace by limiting the circumstances under which any party may unilaterally withdraw during negotiations. Thus, it has reiterated the view expressed in *Hi-Way Billboards* that an impasse is not sufficiently destructive of group bargaining to justify unilateral withdrawal. As a recurring feature in the bargaining process, impasse is only a temporary deadlock or hiatus in negotiations "which in almost all cases is eventually broken, through either a change of mind or the application of economic force." 243 N. L. R. B., at 1093–1094. Furthermore, an impasse may be "brought about intentionally by one or both parties as a device to further, rather than destroy, the bargaining process." *Id.*, at 1094. Hence, "there is little warrant for regarding an impasse as a rupture of the bargaining relation which leaves the parties free to go their own ways." *Ibid.* As the Board sees it, permitting withdrawal at impasse would as a practical matter undermine the utility of multiemployer bargaining.[8]

---

[8] The Board explains that if withdrawal were permitted at impasse, the parties would bargain under the threat of withdrawal by any party who

Of course, the ground rules for multiemployer bargaining have not come into being overnight. They have evolved and are still evolving, as the Board, employing its expertise in the light of experience, has sought to balance the "conflicting legitimate interests" in pursuit of the "national policy of promoting labor peace through strengthened collective bargaining." *Buffalo Linen,* 353 U. S., at 95, 96. The Board might have struck a different balance from the one it has, and it may be that some or all of us would prefer that it had done so. But assessing the significance of impasse and the dynamics of collective bargaining is precisely the kind of judgment that *Buffalo Linen* ruled should be left to the Board. We cannot say that the Board's current resolution of the issue is arbitrary or contrary to law.

If the Board's refusal to accept an impasse, standing alone, as an unusual circumstance warranting withdrawal were the only issue in this case, we would affirm without more. But several Courts of Appeals have rejected *Hi-Way Billboards* on the grounds that impasse may precipitate a strike against one or all members of the unit and that upon impasse the Board permits the union to execute interim agreements with individual employers. These Courts of Appeals consider the possibility of such events as sufficient grounds for any employer in the unit to withdraw.

In *Beck Engraving Co.,* for example, the Court of Appeals for the Third Circuit held that an impasse followed by a selective strike justified unilateral withdrawal from the bargaining unit. Because at that juncture labor relations law, as interpreted by the Board, would permit the union to execute

---

was not completely satisfied with the results of the negotiations. That is, parties could precipitate an impasse in order to escape any agreement less favorable than the one expected. In addition, it is precisely at and during impasse, when bargaining is temporarily replaced by economic warfare, that the need for a stable, predictable bargaining unit becomes acute in order that the parties can weigh the costs and possible benefits of their conduct. Brief for Respondent NLRB 24–25.

an interim agreement with the struck employer, the Court of Appeals concluded that the union and the employer entering into such an agreement would be given unfair advantage against other employers if the latter were not permitted to withdraw from the unit. The Court of Appeals thought the employer's right to withdraw and the union's privilege of executing interim contracts should mature simultaneously. It concluded that the Board's approach too drastically upset the bargaining equilibrium to be justified in the name of maintaining the stability of the bargaining unit.

The Board's reasons for adhering to its *Hi-Way Billboards* position are telling. They are surely adequate to survive judicial review. First, it is said that strikes and interim agreements often occur in the course of negotiations prior to impasse and that neither tactic is necessarily associated with impasse. Second, it is "vital" to understand that the Board distinguishes "between interim agreements which contemplate adherence to a final unitwide contract and are thus not antithetical to group bargaining and individual agreements which are clearly inconsistent with, and destructive of, group bargaining." 243 N. L. R. B., at 1096. In *Sangamo Construction Co.*, 188 N. L. R. B. 159 (1971), and *Plumbers and Steamfitters Union No. 323 (P. H. C. Mechanical Contractors)*, 191 N. L. R. B. 592 (1971), the agreements arrived at with the struck employers were only temporary: both the union and the employer executing the interim agreement were bound by any settlement resulting from multiemployer bargaining. "[I]n both cases, since the early signers maintained a vested interest in the outcome of final union-association negotiations, the multiemployer unit was neither fragmented nor significantly weakened," 243 N. L. R. B., at 1096, and unilateral withdrawal was not justified.

On the other hand, where the union, not content with interim agreements that expire with the execution of a unit-wide contract, executes separate agreements that will survive unit negotiations, the union has so "effectively frag-

mented and destroyed the integrity of the bargaining unit," *ibid.*, as to create an "unusual circumstance" under *Retail Associates* rules. Cf. *Typographic Service Co.*, 238 N. L. R. B. 1565 (1978). Furthermore, the Board has held that the execution of separate agreements that would permit either the union or the employer to escape the binding effect of an agreement resulting from group bargaining is a refusal to bargain and an unfair labor practice on the part of both the union and any employer executing such an agreement. *Teamsters Union Local No. 378 (Olympia Automobile Dealers Assn.)*, 243 N. L. R. B. 1086 (1979). The remaining members of the unit thus can insist that parties remain subject to unit negotiations in accordance with their original understanding.

The Board therefore emphatically rejects the proposition that the negotiation of truly interim, temporary agreements, as distinguished from separate, final contracts, is "inconsistent with the concept of multiemployer bargaining units." 243 N. L. R. B., at 1096. Although interim agreements establish terms and conditions of employment for one or more employer members of the unit pending the outcome of renewed group bargaining, all employers, including those executing interim agreements, have an "equivalent stake" in the final outcome because the "resulting group agreement would then apply to all employers, including each signer of an interim agreement." *Ibid.* Such interim arrangements "preclude a finding that the early signers had withdrawn from the unit." *Ibid.* Although the Board concedes that interim agreements exert economic pressure on struck employers, this fact should no more warrant withdrawal than the refusal of one employer to join with others in a lockout.[9] In any event, the Board's view is that interim agreements, on bal-

---

[9] The Board adopts the language of the First Circuit below: "the uneven application of economic pressure *per se* is not inconsistent with multiemployer bargaining." 630 F. 2d, at 33. In addition, it points out that

ance, tend to deter rather than promote unit fragmentation since they preserve a continuing mutual interest by all employer members in a final associationwide contract.

The Board also rests on this Court's admonition that the Board should balance "conflicting legitimate interests" rather than economic weapons and bargaining strength. Its conclusion is that the interest in unit stability, recognized as a major consideration by both *Buffalo Linen* and *NLRB* v. *Brown*, 380 U. S. 278 (1965), adequately justifies enforcement of the obligation to bargain despite the execution of a temporary agreement.

Of course, no interim or separate agreements were executed in this case. But neither did the impasse initiate any right to execute an agreement inconsistent with the duty to abide by the results of group bargaining. Some Courts of Appeals, taking a different view of the interests involved, question the legitimacy of enforcing the duty to bargain where impasse has occurred and interim agreements have been or may be executed. We think the Board has confined itself within the zone of discretion entrusted to it by Con-

---

the employer also has additional weapons at its disposal for exerting economic pressure. It can engage in a lockout, make unilateral changes in working conditions if they are consistent with the offers the union has rejected, hire replacements to counter the loss of striking employees, and try to blunt the effectiveness of an anticipated strike by stockpiling inventories, readjusting contract schedules, or transferring work from one plant to another. The Board further notes that interim agreements do not always have the effect the Union desires. The signing of an interim agreement may not weaken the association's determination to resist the union's demands, see *Plumbers & Steamfitters Union No. 323 (P. H. C. Mechanical Contractors)*, 191 N. L. R. B. 592 (1971), and the eventual contract settlement may have terms more favorable to the employers than the interim agreements, requiring the union to give up its temporary gains, see *Associated Shower Door Co.*, 205 N. L. R. B. 677 (1973), enf'd on other grounds, 512 F. 2d 230 (CA9), cert. denied, 423 U. S. 893 (1975). Brief for Respondent NLRB 33, nn. 48 and 49.

gress. The balance it has struck is not inconsistent with the terms or purposes of the Act, and its decision should therefore be enforced.

## IV

THE CHIEF JUSTICE, in dissent, is quite right that this case turns in major part on the extent to which the courts should defer to the Board's judgment with respect to the critical factors involved. He is also correct in restating the Court's admonition in *Brown, supra,* at 291, that "[r]eviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." But THE CHIEF JUSTICE does not suggest that the Board seeks here to promote illegitimate ends. Both he and the Board strive to further labor peace through effective collective bargaining. Hence, if the Board's assessment of the impact of impasse and interim agreements on those goals is accepted, it is plain that its decision in this case is consistent with its mandate and promotes the underlying congressional purpose.

THE CHIEF JUSTICE, candidly accepting that the issue is one of balancing the legitimate interests involved, nonetheless disputes the Board's judgment regarding the underlying factors with respect to what would best serve the statutory goals. He rejects the Board's assessment of the significance of impasse and interim agreements in the multiemployer bargaining context and substitutes his own views. For example, he finds that the impasse in this case "was no 'temporary deadlock or hiatus in negotiations' as the Board claims; this was instead a complete breakdown in negotiations coupled with a prolonged strike and lock-out." *Post,* at 422.[10] He

---

[10] The dissent here ignores *Buffalo Linen*'s recognition of whipsawing as a legitimate weapon of economic persuasion in the course of collective bargaining. See *Buffalo Linen,* 353 U. S., at 90, n. 7.

also states, contrary to the Board's judgment, that when the parties have remained at impasse for a long period, "withdrawal of one or a few employers may facilitate rather than frustrate bargaining." *Post,* at 424. Thus, THE CHIEF JUSTICE avers, it would be "more consistent with [the goals of industrial peace] to permit withdrawal and allow negotiation of separate agreements than to force the parties into escalated economic warfare." *Post,* at 425.

THE CHIEF JUSTICE may be quite right. There is obviously room for differing judgments, however, as the conflicting judgments of the Courts of Appeals and the strong views of the Board on the issues now before us make clear. But the dissenting Justices would have us substitute our judgment for those of the Board with respect to the issues that Congress intended the Board should resolve. This we are unwilling to do. If the courts are to monitor so closely the agency's assessment of the kind of factors involved in this case, the role of the judiciary in administering regulatory statutes will be enormously expanded and its work will become more complex and time consuming. We doubt that this is what Congress intended in subjecting the Board to judical review. Indeed, we so held in *Buffalo Linen.*

We agree that the National Labor Relations Act does not constitute the Board as an "arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands," *NLRB* v. *Insurance Agents,* 361 U. S. 477, 497 (1960), or give "the Board a general authority to assess the relative economic power of the adversaries in the bargaining process and to deny weapons to one party or the other because of its assessment of that party's bargaining power," *American Ship Building Co.* v. *NLRB,* 380 U. S. 300, 317 (1965). But the Board has refused to enter that proscribed area, despite the urging of several Courts of Appeals. Instead, it looked at its statutory mandate and duty—to promote labor peace through strengthened collective bargaining—in developing its rule.

In *Brown* itself the Court disagreed with the Board and held that no unfair labor practice occurred when members of a multiemployer unit hired temporary replacements following a lockout. Maintaining the stability of the multiemployer unit was the key to that decision: the Court reasoned that without temporary replacements "the prospect that the whipsaw strike would succeed in breaking up the employer association was not at all fanciful." *Brown*, 380 U. S., at 284. In contrast to its action in *Brown*, the Board in this case has developed a rule which, although it may deny an employer a particular economic weapon, does so in the interest of the proper and pre-eminent goal, maintaining the stability of the multiemployer unit. Because the Board has carefully considered the effect of its rule on that goal, we should defer to its judgment.

*Affirmed.*

JUSTICE STEVENS, concurring.

The Court's holding today does not impair an employer's freedom to structure the manner in which it will conduct collective bargaining. Its opinion, which I join, recognizes the voluntary nature of multiemployer bargaining, see *ante*, at 412, and notes that the Board "neither forces employers into multiemployer units nor erects barriers to withdrawal prior to bargaining." *Ibid.*

The mere fact that an employer bargains in conjunction with other employers does not necessarily mean that it must sign any contract that is negotiated by the group. The Board requires that, to be bound by the terms of group negotiation, the members of an employer association must "have indicated from the outset an unequivocal intention to be bound in collective bargaining by group rather than individual action," and the union representing their employees must "[have] been notified of the formation of the group and the delegation of bargaining authority to it, and [have] assented and entered upon negotiations with the group's representa-

tive." *Weyerhaeuser Co.*, 166 N. L. R. B. 299, 299 (1967), enf'd, 130 U. S. App. D. C. 176, 398 F. 2d 770 (1968). This test is well established in the Courts of Appeals. See, *e. g.*, *NLRB* v. *Beckham, Inc.*, 564 F. 2d 190, 192 (CA5 1977); *Komatz Construction, Inc.* v. *NLRB*, 458 F. 2d 317, 321 (CA8 1972); *NLRB* v. *Hart*, 453 F. 2d 215, 217 (CA9 1971), cert. denied, 409 U. S. 844 (1972); *NLRB* v. *Dover Tavern Owners' Assn.*, 412 F. 2d 725, 727 (CA3 1969). Absent such an unequivocal commitment to be bound by group action, an employer is free to withdraw from group negotiation at any time, or simply to reject the terms of the final group contract. See *Komatz Construction, supra; Ruan Transport Corp.*, 234 N. L. R. B. 241 (1978). In the instant case, petitioner has never questioned the unequivocal character of its commitment to participate in and to be bound by the results of group negotiation.

The Court's holding does not preclude an employer from explicitly conditioning its participation in group bargaining on any special terms of its own design. Presumably, an employer could refuse to participate in multiemployer bargaining unless the union accepted the employer's right to withdraw from the bargaining unit should an impasse develop. The union or the other members of the bargaining unit of course may reject such a condition; in such a case, however, the employer simply would be forced to choose between agreeing to be bound by the terms of group negotiation without a right of withdrawal at impasse, or forgoing the advantages of multiemployer bargaining and bargaining on its own.

CHIEF JUSTICE BURGER, with whom JUSTICE REHNQUIST joins, dissenting.

The Court today affirms the National Labor Relations Board's finding that withdrawal of an employer from a multiemployer bargaining unit, after a long drawn-out and unproductive bargaining impasse, constitutes an unfair labor practice by the employer in violation of §§ 8(a)(1) and (5) of the

National Labor Relations Act, 29 U. S. C. §§ 158(a)(1), (5). In addition, the Court indicates that withdrawal is not permissible even after the union has negotiated separate agreements with other members of the bargaining unit.[1] The Court bases its holding in large part on deference to the views of the Board. Although judicial review of the Board's balancing of conflicting interests is limited, "the balance struck by the Board is [not] immune from judicial examination and reversal in proper cases." *NLRB* v. *Brown,* 380 U. S. 278, 290–291 (1965). When the Board's decisions create an artifical and unwarranted imbalance of economic weapons, the courts are not bound to show abject deference to the Board's views. Today the Court perpetuates an unsupportable imbalance and in so doing damages the very multiemployer bargaining mechanism it seeks to protect—a mechanism of great value to both unions and employers.[2]

## I

The Court holds that the occurrence of an impasse, without more, does not *automatically* trigger a right of an employer

---

[1] "Whipsawing" describes any one of several tactics by which a union creates a situation in which some but not all employers in a multiemployer group are closed or hampered by a strike or lockout. A union may call a strike against one or a few of the employers or, in the face of a lockout, it may negotiate a separate agreement with one or a few employers. Some of the employers are thus unable to conduct business as usual while others are fully operational. The theory behind whipsawing is that the impaired employers, seeing their competitors enjoying a market advantage and fearing that those competitors will increase their market share at the expense of the impaired employer, will be under irresistible pressure to yield to the union's demands.

[2] The multiemployer mode of bargaining, traditionally seen as a defensive reaction by small employers, has become perhaps as important for unions as for employers. As counsel for the union in this case stated during oral argument, the limited funds and personnel of unions often make it very difficult for a union to negotiate separate agreements with each employer in industries where employer units are small.

to withdraw from a multiemployer bargaining unit. If the Court went no further, my objections would be minimal. In this case, however, there was much more than a mere impasse. At the time of the petitioner's withdrawal from the bargaining unit, the negotiations had been stalemated for more than six months, a selective strike and unitwide lockout had kept employees away from their jobs for five months, and there were no signs that the parties would return to the bargaining table. This was no "temporary deadlock or hiatus in negotiations" as the Board claims; this was instead a complete breakdown in negotiations coupled with a prolonged strike and lockout.[3] Nevertheless, the Court holds that employers in the multiemployer group could not withdraw.

The Court then goes on, stating that even when the union negotiates separate "interim" agreements with individual employers the remaining employers cannot withdraw from the bargaining group. Thus, with all of the members of a multiemployer group closed down or crippled by a strike or a lockout, the union is permitted to "divide and conquer" by coming to terms with some of the employers, allowing them to resume operations with a full staff. With one or more competitors fully back in business, the ability of the remaining employers to resist the union demands becomes greatly— and unfairly—diminished. Unable to withdraw, the remaining employers have no defense; they are forced either to submit to the union's demands or to allow fellow members of the group to profit from the strike or lockout. The effect of today's decision is "to deny self-help by employers when legitimate interests of employees and employers collide." *NLRB* v. *Truck Drivers*, 353 U. S. 87, 96 (1957) *(Buffalo Linen)*.

The Board has purported to follow an evenhanded approach to multiemployer bargaining. *The Evening News*

---

[3] As the Board conceded during oral argument, its rule, now endorsed by this Court, prohibits withdrawal even if an impasse and a strike or lockout lasts as long as two years.

*Assn.*, 154 N. L. R. B. 1494 (1965), enf'd *sub nom. Detroit Newspaper Publishers Assn.* v. *NLRB*, 372 F. 2d 569 (CA6 1967). By allowing the union to negotiate interim agreements in order to whipsaw the employer group and yet denying the employers the necessary defense of withdrawal, the Board is hardly living up to its asserted—and mandated—commitment to evenhandedness.

## II

Maintenance of industrial peace requires balancing the interests of labor with those of management; the Court holds that the "difficult responsibility" of striking this balance lies with the Board subject only to "limited judicial review." But judicial review, although limited, is not absent:

> "[T]he phrase 'limited judicial review' [does] not mean that the balance struck by the Board is immune from judicial examination and reversal in proper cases. . . . [W]here, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, '[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.'" *NLRB* v. *Brown, supra*, at 290–292, quoting *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 318 (1965).

The Court's deferral to the Board's conclusion that its rules advance the national labor policy by enhancing stability and promoting collective bargaining represents just the kind of uncritical judicial rubberstamping we have often condemned. *NLRB* v. *Brown, supra*, at 291.

Contrary to the Board's conclusory statements, accepted by the Court, employers who execute interim agreements do not have an equivalent stake in promptly securing a reason-

able final agreement. Such employers are able to operate fully while their competitors are hampered by a strike or defensive lockout; employers covered by interim agreements have a natural economic interest in prolonging the deadlock, thereby increasing their competitive advantage over the employers who remain in the multiemployer group.

The Court also accepts the Board's naked assertion that "interim agreements . . . deter rather than promote unit fragmentation." It is difficult to imagine an event more likely to fragment a multiemployer group than a union's successful whipsawing. Certainly employers will be reluctant to continue their association with other employers who are now encouraged by the Board—and by this Court—selfishly to permit themselves to be used to force the group to yield to the union demands.[4]

Even without the negotiation of interim agreements, when the parties have remained at impasse for a lengthy period, withdrawal of one or a few employers may facilitate rather than frustrate bargaining. The present case is illustrative. Bargaining between the Teamsters and the association was at a stalemate when Bonanno Linen decided to withdraw. That withdrawal did not cause the immediate "disintegra-

---

[4] The Court places great reliance on the notion that the union is only allowed to negotiate interim agreements with individual employers and that negotiation of permanent separate agreements not tied to the final association agreement would permit the remaining employers to withdraw from the unit. This reliance may be misplaced. In *Tobey Fine Papers of Kansas City*, 245 N. L. R. B. 1393 (1979), enf'd, 659 F. 2d 841, 107 LRRM 2221 (CA8 1981), the Board did not permit an employer to withdraw from a multiemployer group even though 2 of the 14 members (representing 42% of the group's employees) had withdrawn with union consent and negotiated separate, permanent agreements. The Board held that "it does not follow *ipso facto* that execution of individual separate final contracts with [withdrawn] Association members either proves an intention to destroy, or necessarily causes the fragmentation of, a multiemployer unit." 245 N. L. R. B., at 1395.

tion" of the bargaining unit, but instead provided the impetus for the union and the remaining employers ultimately to return to the bargaining table and reach agreement. Thus, Bonnano Linen's withdrawal can be seen as fostering the group collective-bargaining process rather than hindering it. In any event, an employer's withdrawal from the multiemployer group is no more disruptive of the bargaining process than a union's decision to use "divide and conquer" tactics.

Industrial peace, it must be remembered, is the primary objective of the federal labor laws; multiemployer bargaining is simply one of many tools used to try to achieve that goal for the benefit of both sides. When a union and a group of employers have reached an impasse and further negotiations would appear to be an exercise in futility, it is more consistent with that goal to permit withdrawal and allow negotiation of separate agreements than to force the parties into escalated economic warfare. Because of differing concerns, it is likely that employers will be able to negotiate agreements individually even though efforts to reach a group agreement failed. By instead forcing the parties to use their economic weapons, the Board's rule runs counter to the congressional goal of industrial peace.

## III

In addition to arguing that its rule barring withdrawal upon impasse enhances the stability of multiemployer groups and promotes collective bargaining, the Board contends that an impasse is neither sufficiently unusual nor adequately determinable to support withdrawal. "Impasse" is a term of art in labor law; the presence of an impasse triggers other important consequences. At impasse, for example, either party may decline to negotiate further. See, *e. g.*, *NLRB* v. *Webb Furniture Corp.*, 366 F. 2d 314, 315 (CA4 1966). In addition, at impasse an employer may unilaterally make changes in terms and conditions of employment provided that the changes are consistent with the proposals it made at the

bargaining table. See, *e. g.*, *NLRB* v. *Tex-Tan, Inc.*, 318 F. 2d 472 (CA5 1963); *Taft Broadcasting Co.*, 163 N. L. R. B. 475 (1967), enf'd *sub nom. American Federation of Television and Radio Artists* v. *NLRB*, 129 U. S. App. D. C. 399, 395 F. 2d 622 (1968).

Because unions and employers have important rights which arise upon impasse, the Board and the courts have acquired considerable experience in determining whether an impasse exists. See, *e. g.*, *NLRB* v. *Tex-Tan, Inc.*, *supra; Taft Broadcasting Co.*, *supra.* It makes little sense to say, as the Board does here, that on the one hand an impasse is too common and indeterminable to permit withdrawal from a multiemployer bargaining unit while on the other hand maintaining that an impasse is sufficiently momentous and ascertainable to allow employers to stop bargaining and make unilateral changes. Moreover, if the Board, after nearly 40 years of dealing with the concept, finds impasse too ill-defined to permit withdrawal, it is high time that the Board exercise its presumed expertise and establish more definite guidelines to identify impasse. Unions and employers are entitled to that guidance.

The Court also accepts the Board's contention that "impasse may be 'brought about intentionally by one of the parties,'" and asserts that "permitting withdrawal at impasse would as a practical matter undermine the utility of multiemployer bargaining." The Court explains that permitting withdrawal upon impasse would allow employers to "precipitate an impasse in order to escape any agreement less favorable than the one expected." This argument ignores a basic element of impasse: impasse is reached only when a stalemate—a breakdown in bargaining—occurs after good-faith negotiations. *NLRB* v. *Crompton-Highland Mills, Inc.*, 337 U. S. 217 (1949); *Cone Mills Corp.* v. *NLRB*, 413 F. 2d 445, 450 (CA4 1969). Intentionally refusing to agree in order to create an impasse and thus facilitate withdrawal—or trigger any of the other rights available upon impasse—is

hardly good-faith bargaining. *Industrial Union of Marine and Shipbuilding Workers* v. *NLRB*, 320 F. 2d 615 (CA3 1963), cert. denied *sub nom. Bethlehem Steel Co.* v. *NLRB*, 375 U. S. 984 (1964); *NLRB* v. *Herman Sausage Co.*, 275 F. 2d 229 (CA5 1960). The Board has ample means to deal with feigned bargaining.

## IV

I would have little difficulty with a rule that a brief cessation of bargaining, without more, does not trigger a right to withdraw from a multiemployer bargaining unit. But the Board has gone much further. No impasse, we are told, no matter how long it lasts or how far apart the parties remain, permits withdrawal. Employers may not withdraw even after the union has negotiated separate agreements with some of the employers in order to force the others in the group into compliance. Absent a more reasonable alternative than that offered by the Board, I would adopt the rule of the Second, Third, and Ninth Circuits and permit withdrawal upon impasse.[5]

JUSTICE O'CONNOR, with whom JUSTICE POWELL joins, dissenting.

I join THE CHIEF JUSTICE in the introductory comments and Part I of his dissent. However, I write separately because I believe labor peace would be advanced by avoiding the absolute positions adopted both by the majority and by the dissent of THE CHIEF JUSTICE. Because I am convinced that the Board should examine the circumstances surrounding and following an impasse to determine whether an unusual circumstance sufficient to justify withdrawal has occurred, and because I cannot accept the Court's conclusory

---

[5] *NLRB* v. *Independent Assn. of Steel Fabricators*, 582 F. 2d 135 (CA2 1978), cert. denied *sub nom. Shopmen* v. *NLRB*, 439 U. S. 1130 (1979); *NLRB* v. *Beck Engraving Co.*, 522 F. 2d 475 (CA3 1975); *NLRB* v. *Associated Shower Door Co.*, 512 F. 2d 230 (CA9), cert. denied, 423 U. S. 893 (1975).

statements concerning the effects of all interim agreements, I respectfully dissent.

## I

The Court agrees with the Board that an impasse is not an unusual circumstance "sufficiently destructive of group bargaining to justify unilateral withdrawal." The Board adopted that position after identifying an impasse as (1) simply a "temporary deadlock or hiatus in negotiations" (2) which may be brought about intentionally by one of the parties and (3) which in almost all cases is "eventually broken, either through a change of mind or the application of economic force." *Charles D. Bonanno Linen Service, Inc.*, 243 N. L. R. B. 1093, 1093–1094 (1979). There are, of course, impasses that fit this description. Others do not. Unfortunately, having developed its premise, the Board has chosen to ignore the reasons which justified it and now "reasons" that an impasse, regardless of duration, does not justify employer withdrawal. The problem with the Board's approach is that it reasons by definition. That is, while an impasse may be a temporary deadlock, a deadlock cannot be made temporary simply by calling it an impasse. Thus, while the rule may be efficient, it does not contribute to principled decisionmaking. This case provides an excellent example of the result which obtains when the Board applies a general rule without analysis of the particular factual situation.

More than a temporary lull in negotiations developed here. When Bonanno withdrew from the bargaining unit in November, the parties had been deadlocked for more than six months. Nevertheless, although the Board defines an impasse as a "temporary" deadlock, it inexplicably views the passage of time as irrelevant to the question of whether something more than a "hiatus" in negotiations was involved.[1]

---

[1] As THE CHIEF JUSTICE notes in his dissent, the Board conceded during oral argument that it will not regard an impasse as an unusual circumstance even if it continues for two years.

Closely related to the Board's view of an impasse as temporary is its view that an impasse is not an unusual circumstance because it is broken in almost all cases either through a change of mind or by the application of economic forces. However, in this case the Board did not determine whether, when Bonanno withdrew, the parties were likely to have broken the impasse. The union and association had unsuccessfully utilized the most common economic weapons: the union had called a selective strike; association members had locked out their drivers; and Bonanno had hired replacement drivers.[2] The Board made no finding that the arsenal of this union or these employers contained additional economic weapons which, if used, might have ended the impasse.

Moreover, neither the Board nor any party to the negotiations suggested that Bonanno precipitated the May 15 impasse as a means to excuse its withdrawal from the association. The Board's third identifying feature of an impasse is thus also missing from this situation.

The impasse which all parties agree existed on May 15 may fit the Board's definition of impasse; the situation which existed on November 21 does not. The point is not that this Court should substitute its judgment as to the "significance of impasse and the dynamics of collective bargaining" for that of the Board. The point is that the Board should be required to analyze, not simply label, a deadlock in negotiations. If the Board had utilized its expertise to examine the facts of this case, it well might have found a complete breakdown in negotiations, not a temporary impasse. When such a complete breakdown occurs, I would afford an employer a right to withdraw.

## II

Neither can I agree with the Court's conclusion that employers who execute interim agreements invariably maintain

---

[2] The parties submitted this dispute on stipulated facts which do not indicate whether other association members hired temporary workers after the strike and lockout, a step which they had the right to take. *NLRB* v. *Brown*, 380 U. S. 278 (1965).

an equivalent stake in securing a final agreement and that interim agreements always deter fragmentation of the employer unit. That conclusion, like the "impasse rule" adopted today, sweeps too broadly. The conclusion is least likely to be accurate when applied to a highly competitive industry which relies upon skilled workers and counts heavily upon repetitive patronage. If one member of a struck employer association in such an industry reaches an interim agreement, he will gain a competitive advantage sufficient to produce a natural and powerful interest in prolonging the deadlock. In fact, the Board has found that an employer with such an advantage is less likely to push for prompt settlement of the labor dispute. See, *e. g.*, *Connell Typesetting Co.*, 212 N. L. R. B. 918 (1974). Moreover, as we recognized in *NLRB* v. *Brown*, 380 U. S. 278 (1965), the notion that allowing a practice which unfairly advantages one employer would "succeed in breaking up the employer association was not at all fanciful." *Id.*, at 284. Likewise, when an interim agreement affords one employer a competitive advantage, the notion that allowing the agreement will promote fragmentation of the bargaining unit is not at all fanciful.

Other factors could also affect the impact of an interim agreement. For instance, an agreement between a union and the employer of 40 percent of a work force could shatter a bargaining unit. Such an agreement with an employer of two percent of the work force might have little effect. No magic inheres in the word "interim," as none inheres in "impasse." Identification of an agreement as "interim" rather than "final" is the beginning, not the end, of the required analysis of the agreement's effect on the bargaining unit. Yet, today the Court gives blanket approval of any interim agreement.[3] Here too, I would require the Board to apply

---

[3] By adopting a *per se* rule that interim agreements never fragment the bargaining unit, the Court takes a position more extreme than that urged by the Board. At least until today, the Board has allowed employer with-

its expertise to determine the effect of such an agreement in a particular instance rather than approve the Board's practice of decision by label. If an agreement, interim or final, operates to fragment a bargaining unit, I would allow withdrawal by an employer.

## III

The goal of multiemployer bargaining is to promote "labor peace through strengthened collective bargaining." *NLRB* v. *Truck Drivers*, 353 U. S. 87, 95 (1957). Neither a complete breakdown in negotiations nor a fragmented bargaining unit furthers that goal. Because today's decision allows both, I dissent.

---

drawal when interim agreements resulted in unit fragmentation. See, *e. g.*, *Typographic Service Co.*, 238 N. L. R. B. 1565 (1978); *Connell Typesetting Co.*, 212 N. L. R. B. 918 (1974). Approval of a rule so favorable to one party to negotiations is hardly the way to encourage multiemployer bargaining or industrial peace.