672 F.2d 741
 110 L.R.R.M. (BNA) 2213, 93 Lab.Cas. P 13,427
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
TEAMSTERS UNION LOCAL NO. 378, affiliated with International
Brotherhood of Teamsters, Chauffeurs, Warehousemen
and Helpers of America, Respondent.
 No. 79-7683.
 United States Court of Appeals,
Ninth Circuit.
 Argued Nov. 5, 1980.
Decided March 24, 1982.
 
 Joseph Oertel, N. L. R. B., Washington, D. C., for petitioner.
 Thomas K. Cassidy, Hafer, Cassidy & Price, Seattle, Wash., for respondent.
 Application for Enforcement of an Order of the National Labor Relations Board.
 Before SNEED and FARRIS, Circuit Judges, and EAST,* District Judge.
 FARRIS, Circuit Judge:
 
 
 1
 The National Labor Relations Board petitions for enforcement of its order requiring Teamsters Local No. 378 to bargain with the Olympia Automobile Dealers Association and prohibiting the Teamsters from giving effect to a separate agreement executed with Capitol Chevrolet Company. The Board's order followed its decision that the Teamsters violated section 8(b)(3) of the National Labor Relations Act, 29 U.S.C. § 158(b)(3), by separately negotiating an agreement with Capitol Chevrolet Company, an employer which had withdrawn from its multi-employer bargaining unit without the unit's consent.
 
 
 2
 We defer enforcement and remand.
 
 FACTS
 
 3
 The Olympia Automobile Dealers Association is a multi-employer bargaining unit that has bargained on behalf of its dealer-members with the Teamsters since 1966. Capitol Chevrolet Company is one of the Association's nine dealer-members.
 
 
 4
 During May 1977, the Association began negotiating separate collective bargaining agreements with the Teamsters and the Machinists, a separate union limited to mechanics. On June 10, the Teamsters and the Association exchanged proposals regarding prospective employee wage increases, but were unable to reach mutually acceptable terms. At approximately the same time, the Machinists threatened to strike the Association's dealer-members if the Association refused to include a cost-of-living clause in their new bargaining agreement.
 
 
 5
 In response to the Machinists' threat, the Association's dealer-members met on June 16 and decided to 1) maintain a "hard money" position against the cost-of-living clause, and 2) propose to the Machinists that their strike be postponed for a week. Harlan Griffith, general manager for Capitol Chevrolet, objected to these tactics, and threatened to withdraw Capitol Chevrolet from the Association unless he was allowed to attend the following bargaining meeting between the Association and the Machinists.
 
 
 6
 Later that same day, representatives from the Association met with the Machinists, with Griffith present as an observer. The Machinists rejected the Association's proposed postponement of the strike. The Association's representatives then caucused and rejected Griffith's proposals to incorporate a cost-of-living clause in the new agreement. When negotiations resumed, Griffith announced Capitol Chevrolet's withdrawal from the Association. Notice of this withdrawal was sent to each dealer-member and the Teamsters, who were also informed that Capitol Chevrolet would be acting as its own agent in future negotiations.
 
 
 7
 Two weeks later, on June 29, the Association's dealer-members voted unanimously to refuse acceptance of Capitol Chevrolet's withdrawal from the Association. Notice of this vote was sent immediately to Capitol Chevrolet, the Machinists and the Teamsters.
 
 
 8
 Despite additional negotiations regarding the proposed wage increase terms, the Teamsters struck the Association's remaining eight dealer-members on July 12. Because Capitol Chevrolet had initiated separate bargaining with the Teamsters after its withdrawal, it was not subject to the strike. By August 25, the Teamsters and Capitol Chevrolet had executed a written agreement, subject to an oral agreement that the contract would be "rolled back" should the Teamsters-Association contract provide for lower costs to the employers.
 
 
 9
 On September 13, 1977, the Association filed refusal-to-bargain charges against the Teamsters, alleging a violation of section 8(b)(3) of the NLRA.[1] Following an unfair labor practice hearing on February 2 and 3, 1978 (while the Teamsters' strike was still in progress), the administrative law judge found that, because the Association did not consent to Capitol Chevrolet's withdrawal, the Association remained the exclusive collective bargaining representative of Capitol Chevrolet. Accordingly, the ALJ held that the Teamsters violated section 8(b)(3) by executing a separate final collective bargaining agreement with Capitol Chevrolet. The ALJ based his conclusion on Retail Associates, Inc., 120 N.L.R.B. 388 (1958), where the Board first ruled that, in the absence of unusual circumstances, withdrawal from multi-employer bargaining after the commencement of bargaining would be permitted only upon "mutual consent." Although recognizing the absence of authority, the ALJ interpreted the mutual consent requirement to include consent by both the union and the multi-employer bargaining unit. The Board affirmed.
 
 DISCUSSION
 
 10
 The Teamsters' appeal questions whether a union commits an unfair labor practice by executing a final agreement with an employer that withdrew from its multi-employer unit without the unit's consent after the commencement of negotiations.
 
 
 11
 The Board and the Teamsters contend that the rules of withdrawal promulgated by the Board in Retail Associates apply. There, when considering the propriety of a union's withdrawal from negotiations, the Board held that, in the absence of "unusual circumstances," withdrawal by a party to multi-employer bargaining after the commencement of negotiations would be permitted only upon "mutual consent." The Teamsters contend that they are guilty of no unfair labor practice, as the mutual consent requirement has been uniformly interpreted as requiring only the union's consent for unilateral withdrawal by an employer. See, e.g., NLRB v. Acme Wire Works, Inc., 582 F.2d 153, 156 (2d Cir. 1978); NLRB v. John J. Corbett Press, Inc., 401 F.2d 673, 675 (2d Cir. 1968); Universal Insulation Corp. v. NLRB, 361 F.2d 406, 408 (6th Cir. 1966); Joseph E. Collins & Co., 184 N.L.R.B. 940 (1970); Metke Ford Motors, Inc., 137 N.L.R.B. 950 (1962). The Board contends that the employer must secure the consent of the multi-employer unit as well. Since there was not unit consent, the Board concluded that the union negotiating with the improperly withdrawn employer had committed an unfair labor practice.
 
 
 12
 Each position oversimplifies Retail Associates. Inherent in the Retail Associates withdrawal rules is the assurance of reasonable stability in multi-employer negotiations after they have commenced, and the avoidance of "a subversion of the employer's right ... to preserve the integrity of associationwide bargaining." Retail Associates, 120 N.L.R.B. at 394-95. See also NLRB v. Truck Drivers Local Union No. 449, 353 U.S. 87, 96-97, 77 S.Ct. 643, 647-648, 1 L.Ed.2d 676 (1957); Carvel Co. v. NLRB, 560 F.2d 1030, 1035 (1st Cir. 1977), cert. denied, 434 U.S. 1065, 98 S.Ct. 1240, 55 L.Ed.2d 766 (1978). See Charles D. Bonanno Linen Service, Inc. v. NLRB, --- U.S. ----, ----, 102 S.Ct. 720, 724, 70 L.Ed.2d 656 (1982) (reviewing Retail Associates ). If we accepted the Teamsters' position, the multi-employer unit would have no role in controlling its members, regardless of its interest in the integrity and solidarity of the unit. The Board's position is the other extreme. It would allow the unit ultimate authority over its members, regardless of the authority actually granted to the unit by its members. Either extreme denies the reality of multi-employer bargaining and imposes unnecessary rigidity on the bargaining process.
 
 
 13
 We agree with the Board that there should be some limitations on a union's or employer's ability to withdraw from multi-employer negotiations after their commencement. The Supreme Court, in Bonanno v. NLRB, --- U.S. ----, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982) (in dicta), cited the Board's decision here with approval, Teamsters Union Local No. 378 (Olympia Automobile Dealers Assn.), 243 N.L.R.B. 1086 (1979). The Court stated:
 
 
 14
 (T)he Board has held that the execution of separate agreements that would permit either the union or the employer to escape the binding effect of an agreement resulting from group bargaining is a refusal to bargain and an unfair labor practice on the part of both the union and any employer executing such an agreement. The remaining members of the unit thus can insist that parties remain subject to unit negotiations in accordance with their original understanding.
 
 
 15
 Bonanno, --- U.S. at ----, 102 S.Ct. at 726 (citations omitted).
 
 
 16
 But the propriety of an employer's withdrawal from its unit should not be divorced from any considerations of the agreement entered into by the employer and the unit before the commencement of negotiations. Compare Teamsters Local No. 378, 243 N.L.R.B. 1086, 1087 n.5 (1979) (holding that legality of employer's withdrawal "does not turn on provision of Association by-laws or articles of incorporation") with Authorized Air Conditioning Co. v. NLRB, 606 F.2d 899, 906 (9th Cir. 1979), cert. denied, 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980) (indicating that provisions of articles of incorporation or by-laws are relevant in determining withdrawal's propriety). Such an agreement is an expression of the degree to which an employer is bound by the contracts negotiated by the unit, and the magnitude of the other employers' interest in maintaining the stability, solidarity, and integrity of the unit. Employers that have delegated, whether by formal or informal agreement, the ultimate authority of negotiations to the unit and agree to be bound by any contract executed by the unit have the right to have this agreement respected by other signatories. Cf. Bonanno, --- U.S. at ----, 102 S.Ct. at 728-29 (Stevens, J. concurring) (emphasizing voluntary nature of multi-employer bargaining); H. & D., Inc. v. N. L. R. B., 670 F.2d 120, 122 (9th Cir. 1982) (multi-employer bargaining unit established by employer's conduct). These employers should have a greater ability to prevent an employer-member from executing a separate agreement with a union than do the members of a unit where no such mutual commitment exists. As a consequence, we agree with the Board that, in at least these limited situations, a unit having obtained full authority to negotiate for its members should be able to charge a break away signatory with an unfair labor practice and have any separate agreement set aside.
 
 
 17
 This decision is not inconsistent with our recent decision in Seattle Auto Glass, et al. v. N. L. R. B., et al., 669 F.2d 1332, 1336 (9th Cir. 1982), holding that where a union enters into a permanent separate agreement with a substantial member of a multi-employer bargaining unit the remaining members of the unit are privileged to withdraw. Members of a multi-employer bargaining agreement should be held to the agreement only as long as its terms are satisfied. When a member abandons his right to independently negotiate with a union and joins a multi-employer bargaining unit, one of the bargained-for terms is a guarantee that the other unit members will jointly negotiate. The bargain is changed and the terms are no longer satisfied if one of the substantial members drops out of the unit during negotiations. Thus, once a separate permanent agreement exists between a substantial member of a multi-employer bargaining unit and the union, the remaining members of the unit may choose to withdraw. Id. at 9; see also Bonanno, --- U.S. at ----, 102 S.Ct. at 726.
 
 
 18
 We need not decide today whether a unit member, who legitimately withdraws from the unit after another member signs a separate permanent agreement, can be forced back into the unit if the separate permanent agreement is subsequently nullified in an unfair labor practice proceeding. As the Supreme Court has previously stated, we leave to the National Labor Relations Board the job of balancing conflicting interests.
 
 
 19
 Conflict may arise, for example, between ... (one right) ... and the interest of small employers in preserving multi-employer bargaining as a means of bargaining on an equal basis with a large union and avoiding the competitive disadvantages resulting from nonuniform contractual terms. The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.
 
 
 20
 N. L. R. B. v. Truck Drivers Local Union, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1956). See also Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).
 
 
 21
 We reject the Board's conclusion, that an agreement among employers to restrict withdrawals from the unit creates liability for a union that, unaware of such an agreement, negotiates with an improperly withdrawn employer. In Retail Associates, the Board ruled that a party wishing to withdraw from multi-employer bargaining must notify all other parties of its unequivocal withdrawal prior to the commencement of negotiations. 120 N.L.R.B. at 394. The function of this notice is to apprise all parties of the interests at stake in the negotiations, prevent destabilization of the bargaining process caused by expedient withdrawals by unhappy parties, and otherwise ensure that all parties have the same expectations of the bargaining process. Similar purposes would be served by requiring that an employer unit notify the union with which it negotiates of any solidarity agreement reached by the unit-employers. We do not require that an employer-unit in every case obtain such an agreement from its members to engage in multi-employer bargaining, but notice to the union of any existing agreement prior to negotiations is necessary before the employer-unit may charge a union with an unfair labor practice for negotiating with an improperly withdrawn employer.
 
 
 22
 Although the ALJ concluded that the Association notified the union of the Association's rejection of the Company's withdrawal, the ALJ made no findings 1) regarding the existence of an agreement among the Association's employer-members, or 2) of whether notice of such an agreement had been sent to the union prior to negotiations. Because findings on either of these points are determinative, we remand the case to the Board for factual determinations.[2]
 
 
 23
 Remanded.
 
 
 
 *
 Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 Section 8(b)(3) of the NLRA provides that: "It shall be an unfair labor practice for a labor organization or its agents ... to refuse to bargain collectively with an employer ...." 29 U.S.C. § 158(b)(3)
 On October 3, 1977, the Association filed charges against Capitol Chevrolet, alleging its violation of § 8(a)(1) and § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(1), (5). These charges were severed from those against the Teamsters, and settled.
 
 
 [2]
 The Board also ruled that, absent unusual circumstances, an employer's withdrawal from the unit without the unit's consent constituted a violation of § 8(a)(5) as of the time of the withdrawal. In adopting this rule, the Board expressly overruled three cases indicating that an employer's mere withdrawal did not violate § 8(a)(5), although its refusal to execute and apply the agreement reached by the unit did violate § 8(a)(5). Because this case does not involve charges brought against a withdrawing employer, we need not express an opinion regarding the Board's adoption of this rule. However, on remand the Board may wish to supplement this rule with reasons for its adoption