Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 28, 2004        Decided November 30, 2004

No. 03-1369

RESORT NURSING HOME AND
KINGSBRIDGE HEIGHTS REHABILITATION CARE CENTER,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

NEW YORK HEALTH AND HUMAN SERVICE UNION
1199/SEIU, AFL–CIO,
INTERVENOR

————

Consolidated with
03-1422

————

On Petition for Review and
Cross-Application for Enforcement of an
Order of the National Labor Relations Board

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Joel E. Cohen* argued the cause and filed the briefs for petitioners.

*Ruth E. Burdick*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Frederick L. Cornell, Jr.*, Supervisory Attorney.

*Daniel J. Ratner* argued the cause for intervenor. With him on the brief was *Judith A. Scott*.

Before: GINSBURG, *Chief Judge*, and EDWARDS and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: Resort Nursing Home ("Resort") and Kingsbridge Heights Rehabilitation Care Center ("Kingsbridge") petition for review of an order of the National Labor Relations Board ("NLRB" or "Board"), and the Board cross-applies for enforcement. The Board held that Resort and Kingsbridge (collectively, "the Homes") committed unfair labor practices in violation of § 8(a)(1) and (5) and § 8(d) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1), (a)(5), (d) (2000), by refusing to execute and failing to abide by a collective bargaining agreement negotiated by New York Health & Human Services Union 1199/SEIU, AFL-CIO ("Union") and the Greater New York Health Care Facilities Association ("Greater New York" or "Association"), a multi-employer association of which the Homes were members. *See Resort Nursing Home*, 340 N.L.R.B. No. 77 (Sept. 30, 2003) ("Decision"), *reprinted in* Joint Appendix ("J.A.") at 760, *available at* 2003 WL 22287369. In reaching this conclusion, the Board found that the Homes were bound by the collective bargaining agreement arrived at through multi-employer bargaining, because their attempted withdrawal from the multi-employer bargaining unit was legally ineffective.

Under *Retail Associates, Inc.*, 120 N.L.R.B. 388 (1958), withdrawal from multi-employer bargaining is not permitted after the commencement of negotiations, "absent unusual

circumstances." *Id.* at 395. In this case, the Association and the Union commenced negotiations on a new agreement, without notice to the Homes, more than eight months before the expiration of the existing contract. The Homes contend that the early commencement of negotiations justified their untimely withdrawal from the multi-employer bargaining unit. Relying on its decision in *Chel LaCort*, 315 N.L.R.B. 1036 (1994), the Board found no "unusual circumstances" and held that the Homes were bound by the terms of the parties' new agreement.

The Homes now seek review of the Board's decision, challenging the *Chel LaCort* rule as "misguided and unfair." The Homes also argue that the Board erred in rejecting their claim that the Union and the Association colluded to keep their negotiations secret from the Homes. Finally, the Homes contend that the collective bargaining agreement is not binding on them, because it was never ratified by the Association's members.

We deny the petition for review and grant the Board's cross-application for enforcement. The rule adopted in *Chel LaCort* is a reasonable effort by the Board to balance the competing statutory interests of voluntariness and stability in collective bargaining relationships, and we thus defer to the Board's judgment. We further hold that substantial evidence supports the Board's rejection of the Homes' claim that the Union and the Association colluded to keep the negotiations secret. Finally, reviewing the collective bargaining agreement *de novo*, we conclude that ratification by the Association's members was not required.

## I. BACKGROUND

### A. *The Facts*

The facts of this case are fully recounted in the Board's decision, *see* Decision, slip op. at 1, 2-5, J.A. at 760, 761-64, so we merely summarize the most salient facts here.

Resort and Kingsbridge are nursing homes located, respectively, in Far Rockaway and the Bronx, New York. Although

separate corporations, they share common ownership and control. The Union represents the registered nurses, licensed practical nurses, and para-professionals employed by the Homes, as well as those employed by other nursing homes in New York and New Jersey. The Association is a multi-employer association that provides a range of services to its members, including educational seminars, compliance review and education regarding occupational safety and health regulations, market research, legal counsel for labor grievances and arbitrations, and, most relevant for our purposes, collective bargaining.

In 1997, the Association and the Union negotiated a collective bargaining agreement that, by its terms, was to remain in effect until September 30, 2002. At that time, the Homes were members of the Association and had agreed to be bound by multi-employer bargaining between the Association and the Union.

Over time, the Homes increasingly became dissatisfied with the Association's representation. In the summer of 2000, the Homes retained their own labor counsel, Joel Cohen, to handle grievances, arbitrations, and other matters. On September 7, 2000, after the Association filed a grievance against the Union on Kingsbridge's behalf, Cohen advised the parties' permanent arbitrator (by a letter which he copied to Union and Association representatives) that he "represent[ed] Kingsbridge . . . in all labor matters" and that the grievance filed by the Association "was sent without my knowledge and without Kingbridge's authorization." Although the Association objected to Cohen's letter, asserting that the Association was authorized to represent Kingsbridge with respect to the grievance, Cohen subsequently handled all of the grievances and arbitrations that arose between the Homes and the Union in 2000 and 2001.

In June and July 2001, the Homes stopped paying membership dues to the Association. On September 7, 2001, the Association demanded payment of the outstanding dues, warning the Homes: "If we do not receive payment from you by the 21st of September all services will be suspended." By

December 13, 2001, the Association informed the Homes that it had instructed its staff to suspend all services to them.

Meanwhile, sometime prior to January 9, 2002 (*i.e.*, more than eight months before the existing collective bargaining agreement was set to expire), the Association and Union commenced bargaining on a new contract. On January 9, the Association sent a letter to the Union "confirm[ing] the intent of the Association ... to enter into an extension of the current collective bargaining agreements." The letter memorialized understandings on the principal terms and conditions for a new contract, including specific wage rates. After formal bargaining sessions on January 23 and February 1, 2002, the Union and Association entered into an agreement renewing the terms of the existing contract through April 30, 2005. The agreement provided for a wage increase to go into effect on May 1, 2002. The terms of the final agreement – including the specific wage rates – were substantially identical to the terms in the January 9 letter of intent. The agreement also listed the members of the Association, including Kingsbridge and Resort.

On January 31, 2002, upon learning of the ongoing negotiations between the Union and the Association, Kingsbridge advised the Union "that at this time Greater New York has discontinued servicing our facility, and as such, will not be negotiating on our behalf." Similarly, on February 11, 2002, Resort wrote to the Union, stating: "I am certain you are aware of the fact that the ... Association has discontinued all services for Resort. I would therefore like to remind you that [the Association] will no longer be negotiating any collective bargaining agreements on our behalf."

The Union, for its part, maintained that the Homes were bound by the terms of the new agreement. On April 24, 2004, the Union filed an unfair labor practice charge against the Homes, alleging that their refusal to execute and abide by the agreement was unlawful under the Act.

## B. *Withdrawal from Multi-employer Bargaining Units*

Until 1958, the NLRB permitted both employers and unions to abandon multi-employer bargaining units at any time,

even in the middle of bargaining. *Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 410 (1982) (collecting NLRB decisions). In *Retail Associates*, however, the Board established a set of rules regulating withdrawal from multiemployer bargaining units, as follows:

> We [will] refuse to permit the withdrawal of an employer or a union from a duly established multiemployer bargaining unit, except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multiemployer negotiations. Where actual bargaining negotiations based on the existing multiemployer unit have begun, we [will] not permit, except on mutual consent, an abandonment of the unit upon which each side has committed itself to the other, absent unusual circumstances.

120 N.L.R.B. at 395. In reaching this decision, the Board relied upon "the fundamental purpose of the Act of fostering and maintaining stability in bargaining relationships":

> While mutual consent of the union and employers involved is a basic ingredient supporting the appropriateness of a multiemployer bargaining unit, the stability requirement of the Act dictates that reasonable controls limit the parties as to the time and manner that withdrawal will be permitted from an established multiemployer bargaining unit.

*Id.* at 393.

Following the decision in *Retail Associates*, the Board determined that "unusual circumstances" that would justify withdrawal after the commencement of bargaining normally would be found only when an employer is subject to extreme financial pressures or when a bargaining unit is substantially fragmented. *Charles D. Bonanno Linen*, 454 U.S. at 411 & n.6 (citing authorities). Apart from these circumstances, the Board has construed "unusual circumstances" very narrowly. *See* Decision, slip op. at 6, J.A. at 765 (describing Board decisions refusing to find unusual circumstances). Most per-

tinent for this case, the Board in *Chel LaCort* addressed the "situation[ ] where the multiemployer association fails, either deliberately or otherwise, to inform its employer-members of the start of negotiations." 315 N.L.R.B. at 1036. Noting that the "unusual circumstances" exception "has historically been limited to only the most extreme situations," *id.*, the Board decided that the situation in that case did not warrant an extension of the exception. *Id.* at 1036-37.

## C. *Proceedings Below*

After a trial on the record in which the facts detailed above were established, the Administrative Law Judge ("ALJ") issued his decision. *See* Decision, slip op. at 2-9, J.A. at 761-68. He noted that "there is no dispute about the fact that neither [Resort nor Kingsbridge] sent any type of written communications to the Union or to the Association prior to the commencement of negotiations that they were withdrawing their authorizations to have the Association bargain on their behalf." *Id.*, slip op. at 3, J.A. at 762. The ALJ determined that the Homes neither knew nor had reason to know of the early commencement of negotiations, *id.*, slip op. at 5, 7, J.A. at 764, 766, but he noted that, under *Chel LaCort*, this did not constitute "unusual circumstances" justifying an untimely withdrawal, *id.*, slip op. at 6-8, J.A. at 765-67. Therefore, because the Homes' attempt to withdraw was legally insufficient, the ALJ concluded that their refusal to execute and abide by the agreement negotiated by the Association and Union violated § 8(a)(1), (a)(5), and (d) of the Act. *Id.*, slip op. at 8, J.A. at 767.

After exceptions were filed, the Board affirmed the ALJ's rulings, findings, and conclusions. *Id.*, slip op. at 1, J.A. at 760. The Homes now petition for review, and the Board cross-applies for enforcement.

## II. ANALYSIS

## A. *The* Chel LaCort *Rule*

The Homes do not dispute that they failed to provide adequate written notice of withdrawal prior to the commence-

ment of bargaining between the Union and the Association. Accordingly, the Homes concede that, under *Retail Associates*, they are bound by the results of the multi-employer bargaining if "unusual circumstances" do not exist. The Homes, however, challenge the rule adopted by the Board in *Chel LaCort*, arguing that the early commencement of negotiations without notice should constitute "unusual circumstances" justifying their untimely withdrawal.

We will uphold a Board rule as long as it is rational and consistent with the Act, even if we would have formulated a different rule had we sat on the Board. *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990); *Finerty v. NLRB*, 113 F.3d 1288, 1291 (D.C. Cir. 1997). In the context of multi-employer bargaining, the Supreme Court has specifically instructed that, through statutory silence, Congress "intended to leave to the Board's specialized judgment" the resolution of the inevitable questions concerning multi-employer bargaining bound to arise in the future. *Charles D. Bonanno Linen*, 454 U.S. at 409 (citing *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96 (1957) ("*Buffalo Linen*")). In other words, the court has no business second-guessing the Board's judgment in this area unless it infringes the Act or defies reason. We conclude that the *Chel LaCort* rule is "rational and consistent with the Act," *Curtin Matheson Scientific*, 494 U.S. at 787, and must therefore be upheld.

The Supreme Court has observed that, in regulating withdrawal from multi-employer units, the Board has been required to balance conflicting interests:

> The Board has recognized the voluntary nature of multiemployer bargaining. It neither forces employers into multiemployer units nor erects barriers to withdrawal prior to bargaining. At the same time, it has sought to further the utility of multiemployer bargaining as an instrument of labor peace by limiting the circumstances under which any party may unilaterally withdraw during negotiations.

*Charles D. Bonanno Linen*, 454 U.S. at 412. In that case, the Court refused to upset the Board's decision not to accept a bargaining impasse as an unusual circumstance justifying an untimely withdrawal. The Court emphasized that it is for the Board, "employing its expertise in the light of experience . . . to balance the 'conflicting legitimate interests' in pursuit of the 'national policy of promoting labor peace through strengthened collective bargaining.'" *Id.* at 413 (quoting *Buffalo Linen*, 353 U.S. at 95, 96). Although "[t]he Board might have struck a different balance from the one it has," the Court concluded, "assessing the significance of impasse and the dynamics of collective bargaining is precisely the kind of judgment that *Buffalo Linen* ruled should be left to the Board." *Id.*

We have similarly held that where the Board balances competing statutory interests – such as the interests in voluntariness and stability implicated by the rules regulating withdrawal from multi-employer bargaining – "[i]t is not the role of the court to promulgate new rules, or exceptions to existing rules, in order to effectuate one statutory purpose . . . at the expense of another." *Terrace Gardens Plaza, Inc. v. NLRB*, 91 F.3d 222, 228 (D.C. Cir. 1996). Instead, once we conclude that the Board's rule is "reasonably calculated to reconcile those potentially conflicting objectives, our job is at an end." *Id.*

In *Chel LaCort*, the Board explained that the *Retail Associates* rules rest on the Act's "fundamental purpose of fostering and maintaining stability of bargaining relationships," and that the "unusual circumstances" exception "has historically been limited to only the most extreme situations." *Chel LaCort*, 315 N.L.R.B. at 1036. In deciding that the "unusual circumstances" exception should not be extended to situations where a multi-employer association fails to inform an employer of the commencement of negotiations, the Board explained that "[w]hether and to what extent a multiemployer association communicates with its members is an internal association matter which is properly and readily resolved by and between the multiemployer association and its members." *Id.* at 1036-37. The Board was unwilling to "effectively . . . impos[e] a

notice requirement on the multiemployer association and insert[ ] [itself] into the association/member relationship unnecessarily and with uncertain consequences." *Id.* at 1037. The Board further recognized that "imposing such a notice requirement on the multiemployer association might actually have the effect of imposing such a requirement on the union, for the only way the union could be sure that such notice was given and that the employer-members would be bound would be to give such notice itself." *Id.* at 1037 n.6. We think that this explanation is "both clear and reasonable," *Epilepsy Found. of N.E. Ohio v. NLRB*, 268 F.3d 1095, 1102 (D.C. Cir. 2001), and provides ample justification for the Board's position.

The Homes argue, however, that in adopting the *Chel LaCort* rule, the Board gave undue weight to "stability" at the expense of "voluntariness." We disagree. The balance struck by the *Chel LaCort* Board sufficiently preserves the statutory interest in voluntariness and is therefore entitled to deference.

For one thing, the *Chel LaCort* situation does not arise until after an employer voluntarily delegates bargaining authority to a multi-employer association. As the *Chel LaCort* Board itself noted, an employer can always protect itself through its arrangement with the association. For example, an employer could require the association to provide notice before commencing negotiations. Although it is true that, under *Chel LaCort*, an employer would be bound even if an association violated its agreement with the employer, this is analogous to the result that would obtain under common law agency principles. *Cf. Wittlin v. Giacalone*, 171 F.2d 147, 148 (D.C. Cir. 1948) ("Where an agent is clothed with either real or apparent authority to act, proof of secret instructions is not a good defense to defeat the rights of innocent third parties."). *See generally* 3 Am. Jur. 2d *Agency* §§ 75-78, 262 (2002) (describing liability of principal to third parties based on apparent authority of agent). As is often the case in principal-agent situations, the employer's remedy would be against its agent.

Moreover, at any time (prior to the commencement of negotiations), an employer who becomes dissatisfied with the multi-employer association may revoke its delegation of bargaining authority. In this case, for example, the Homes clearly had become disenchanted with the Association's representation by the summer or fall of 2001. At that time, the Homes could have sent notice of their withdrawal from multi-employer bargaining, and there would have been no question of their being bound by the subsequently negotiated agreement. It does not matter whether the Homes reasonably could have anticipated that bargaining would commence early. Nothing prevented the Homes from fully protecting themselves from an unexpected agreement by giving notice of withdrawal in June of 2001 when they stopped paying Association dues.

Indeed, any employer who wishes to ensure that it will not be bound by an unexpected agreement may simply revoke its delegation of bargaining authority immediately after signing a contract. The Homes acknowledge the availability of this option for an employer that does not trust its multi-employer association, but argue that this process would undermine the very stability in bargaining relationships that the Board claims to advance. *See* Reply Br. for Pet'rs at 8. But it is not for us to predict whether the prospect of employers withdrawing as a matter of course would undermine stability more than a requirement of notice would. Such an assessment "is precisely the kind of judgment that . . . should be left to the Board." *Charles D. Bonanno Linen*, 454 U.S. at 413.

In sum, the Board articulated a defensible justification for the rule in *Chel LaCort*. The Homes' argument that the rule violates the fundamental statutory interest in voluntariness fails inasmuch as the rule applies only after an employer has *voluntarily* agreed to be bound by the fruits of multi-employer bargaining. Given this starting point, it was perfectly reasonable for the Board to place the burden of withdrawal on employers who voluntarily elect association representation in multi-employer bargaining. If an employer is dissatisfied with the representation of its multi-employer

association, it retains its remedies against the association under contract and agency law.

**B. *The Board's Finding Regarding Collusion***

Noting that there was "no evidence" of any "collusion or conspiracy involving the Union," the *Chel LaCort* Board left open the possibility that such evidence might be sufficient to show "unusual circumstances." 315 N.L.R.B. at 1036-37 n.5. The Homes argue that the Board erred in rejecting their claim in this case that "the Union and the Association colluded to keep their negotiations a secret." *See* Decision, slip op. at 8, J.A. at 767.

The Board's findings of fact are "conclusive" if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e)-(f) (2000). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Evergreen Am. Corp. v. NLRB*, 362 F.3d 827, 837 (D.C. Cir. 2004) (internal quotation marks omitted). Thus, we reverse for lack of substantial evidence "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Id.* (internal quotation marks omitted). We conclude that substantial evidence supports the Board's rejection of the Homes' claim of collusion.

At the outset, we note that, inasmuch as the employer in *Chel LaCort* was provided no notice of the commencement of negotiations, *see* 315 N.L.R.B. at 1036, it is clear that the "collusion" contemplated by that case entails something more than a mere failure (even if deliberate) to provide such notice. Since its decision in the instant case, the Board has clarified that "[t]he 'collusion or conspiracy' referred to by the *Chel* Board's dictum clearly contemplates actions by the union and the employer association that are deliberately intended to prevent an employer from exercising its right to withdraw." *D.A. Nolt, Inc.*, 340 N.L.R.B. No. 152, 2003 WL 22970620, at *4 (Dec. 15, 2003). On the record before us, we hold that it was reasonable for the Board to conclude that the Association and Union did not deliberately collude to prevent the Homes from exercising their right to withdraw.

The evidence pressed by the Homes is unavailing. In arguing for a finding of collusion, the Homes principally point to the early start of negotiations, the occurrence of substantial negotiations prior to the formal negotiation sessions on January 23 and February 1, 2002, the Association's knowledge that some members may have been unaware of the negotiations, and the fact that the only participant in the negotiations on the Association's behalf was its executive director. These alleged facts, even if true, do not compel a finding of impermissible collusion, for the simple reason that a mere failure to provide notice, even if deliberate, is insufficient to find proscribed collusion.

The Board determined that the early commencement and quick pace of the negotiations resulted from the parties' concern that, after the terrorist attacks in New York on September 11, 2001, "State money might be diverted to other purposes and inasmuch as much or most of the money derived especially by nursing homes comes from State funding, via Medicaid, it would be a good idea to finalize collective-bargaining agreements (together with discussion with State officials), so that the Union and the employers would be able to go to the State legislature to lobby, ahead of other supplicants, for allocations from the upcoming State budget." Decision, slip op. at 3, J.A. at 762. This finding was directly supported by testimony from the Union's attorney and executive vice president, as well as the Association's executive director. *See* Hr'g Tr. at 39, 108-10, 252-54, 276-79, *reprinted in* J.A. at 45, 114-16, 260-62, 286-89. In accepting this explanation, the Board reasonably concluded that the parties had not impermissibly colluded or conspired to deliberately prevent the Holmes from exercising their right to withdraw from the multi-employer bargaining unit.

## C. *Ratification*

Finally, the Homes argue that the collective bargaining agreement is not binding upon them because it was never ratified. Resolution of this matter turns on the meaning of the agreement's ratification clause, which provides:

> This agreement is subject to ratification by the 1199 membership, 1199 and the Association.

2002 Memorandum of Agreement Between the Union and the Association at 6, *reprinted in* J.A. at 493. At oral argument, counsel for the Homes acknowledged that their objection is and always has been only that the members of the Association did not ratify the agreement – not that the Association itself did not ratify it. *See* Recording of Oral Argument at 42:18-43:03, 46:57-47:41.

In contrast to the deference owed the Board's findings of fact and interpretations of the Act, we accord no deference to the Board's interpretation of collective bargaining agreements. *Commonwealth Communications, Inc. v. NLRB*, 312 F.3d 465, 468 (D.C. Cir. 2002). Having reviewed the contract *de novo*, we reject the Homes' suggestion that the disputed collective bargaining agreement was subject to ratification by the Association's members.

The ratification clause, by its plain language, does not require ratification by the members of the Association. On its face, the ratification clause requires ratification only by the Union, the Union's members, and the Association. The separate references to the *Union* and the *Union's membership* stand in stark contrast to the single reference to the *Association*. This undermines the Homes' argument that the requirement of ratification by the Association really means ratification by the Association's members. Ratification by "the Association" is not the same as ratification by "the Association's members."

The Homes do not claim that a contract that provides for "ratification by . . . the Association" is somehow unlawful. Rather, they argue that this interpretation of the ratification clause is implausible. It makes no sense, they claim, to require ratification by the Association itself when the Association, through its executive director, is already a signatory to the agreement. The Homes' argument fails for two reasons. First, as already noted, the clause expressly requires ratification by the Union (as distinct from the Union membership) even though the Union was also a signatory to the agreement.

More fundamentally, it is simply not implausible or absurd to require ratification by the Association, as there are a variety of ways in which an association might structure the process of ratifying a contract negotiated by its agent. For example, an association might authorize its board of directors to ratify a collective bargaining agreement negotiated by an officer. Alternatively, as claimed to be the arrangement here, an association might authorize its executive director to affirm the agreement after an informal process of consultation and deliberation. *See* Hr'g Tr. at 280-82, J.A. at 290-92 (testimony of Bart Lawson, executive director of the Association).

The parties to collective bargaining agreements are free to "ratify" agreements as they see fit within the bounds of the law. There are no absolutely right and wrong ways to achieve ratification, nor is there any binding norm which compels only one view of ratification. We therefore conclude that the collective bargaining agreement at issue here does not require ratification by the Association's members and reject the Homes' argument that the agreement is void for lack of such ratification.

### III. CONCLUSION

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement.