

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-4-2005

# NLRB v. DA Nolt Inc

Precedential or Non-Precedential: Precedential

Docket No. 04-2321

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"NLRB v. DA Nolt Inc" (2005). *2005 Decisions.* Paper 1107.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1107

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 04-2321, 04-2681

———

NATIONAL LABOR RELATIONS BOARD

Petitioner/Cross-Respondent

v.

D.A. NOLT, INC.

Respondent/Cross-Petitioner

———

Application for Enforcement and Cross-Petition for Review
of an Order of the National Labor Relations Board
(Nos. 4-CA-30325-1, 4-CA-30325-2)

———

Argued: February 14, 2005

Before: SLOVITER, AMBRO and ALDISERT, <u>Circuit Judges</u>

(Filed: May 4, 2005)

———

David Habenstreit (Argued)
Kira D. Vol
Aileen A. Armstrong
National Labor Relations Board
1099 14th Street, NW
Washington, D.C. 20570

         Attorney for Petitioner/Cross-Respondent

Thomas C. Zipfel (Argued)
Cohen, Seglias, Pallas, Greenhall & Furman, P.C.
1515 Market Street, Eleventh Floor
Philadelphia, PA 19102

         Attorney for Respondent/Cross-Petitioner

———

OPINION OF THE COURT

———

ALDISERT, Circuit Judge.

We must evaluate an Application for Enforcement by the National Labor Relations Board ("the Board") and a Cross-Petition for Review by D.A. Nolt, Inc. ("D.A. Nolt"). In a split decision, the Board held that D.A. Nolt was bound to a successor agreement negotiated by the Roofing Contractors' Association (the "RCA") and United Union of Roofers, Waterproofers and Allied Workers ("the Union"). It concluded that there were no "unusual circumstances" to justify D.A. Nolt's withdrawal from the agreement because the conduct at issue did not constitute "collusion or conspiracy" as contemplated by the dicta in Chel LaCort, 315 NLRB 1036 (1994).

We must determine whether the following legal conclusions of the Board are rational and consistent with the National Labor Relations Act ("the Act"): (1) the conduct at

issue did not constitute "unusual circumstances;" and (2) even if "unusual circumstances" had existed, D.A. Nolt had forfeited its opportunity to withdraw from the RCA. We have jurisdiction over the Board's Application for Enforcement pursuant to 29 U.S.C. § 160(e) and D.A. Nolt's Cross-Petition for Review pursuant to 29 U.S.C. § 160(f). We will uphold a Board rule as long as it is rational and consistent with the Act, even if we would have formulated a different rule had we sat on the Board. NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 787 (1990). Although judicial review of the Board's balancing of conflicting interests is limited, "the balance struck by the Board is [not] immune from judicial examination and reversal in proper cases." NLRB v. Brown, 380 U.S. 278, 290-291 (1965). "When the Board's decisions create an artificial and unwarranted imbalance of economic weapons, the courts are not bound to show abject deference to

4

the Board's views." <u>Charles D. Bonanno Linen Serv., Inc. v.</u> <u>NLRB</u>, 454 U.S. 404, 421 (1982) (Burger, J., dissenting).

We will deny the Board's Application for Enforcement and grant D.A. Nolt's Cross-Petition for Review. We conclude that the Board's holding is not rational or consistent with the Act.

I.

D.A. Nolt is a corporation engaged in commercial, industrial and residential roof repair and installation. David Nolt ("Nolt") is the president who incorporated the business in 1990. The RCA is a multiemployer bargaining association of contractors who perform commercial roofing work. Richard Harvey is the executive director of the RCA. The Union has historically entered into collective bargaining agreements with the RCA. Tom Pedrick is vice-president of the Union.

5

Since 1993, the RCA and the Union have entered into collective bargaining agreements ("RCA agreements") covering commercial work. Historically, negotiations are conducted between the Union and the RCA, and after an agreement is reached, copies are sent to independent employers for their acceptance and execution. Generally, a new RCA agreement is negotiated approximately three months before the expiration of the old RCA agreement.

Nolt signed assents binding D.A. Nolt to the terms of the 1993-1997 and 1997-2001 RCA agreements. In June 1999, Nolt signed a Bargaining Agent Authorization ("BAA") with the RCA, allowing the RCA to negotiate a new commercial roofing contract with the Union on behalf of D.A. Nolt. Under the BAA, an employer may withdraw from the RCA 90 days prior to the expiration of the contract in place at that time.

In June, 2000, ten months before expiration of the 1997-2001 RCA agreement, Pedrick, vice-president of the Union, initiated a discussion with Harvey, executive director of the RCA, about beginning negotiations for the subsequent RCA agreement. Negotiating committees for the Union and the RCA began discussing the terms of a new, eight year contract. Harvey testified that, in the course of negotiations, Union officials told him that they did not want the Union membership to become aware of the terms being discussed and they asked if the RCA would keep the negotiations confidential. Harvey testified that the Union and the RCA agreed to keep the negotiations secret from their respective memberships. Michael McCann, the Union's business manager, denied that the negotiations were kept secret from the Union membership.

On July 5, 2000, Harvey faxed a memorandum of the

agreement to the Union and the eight employer-members of the negotiating committee. Following their vote for ratification, Harvey then faxed the agreement to the ten other employer-members who were not included in the negotiating committee, including D.A. Nolt. According to Harvey, there was continued concern that the terms of the agreement would reach the employee-members of the Union. To avoid that possibility, Harvey testified that each owner was instructed to stand by their fax machines to receive the memorandum of agreement, ballot and cover letter.

The July 12, 2000, cover letter for the agreement instructed each member that the ballot had to be returned by July 14, 2000, and to vote for one of three options: (1) acceptance; (2) rejection; or (3) withdrawal from the RCA. Regarding the last option, the cover letter stated:

Members who wish to exercise their right to withdraw

> their bargaining agent authorization from the Association . . . must do so at this time and should not vote to accept or reject the tentative agreement, but rather should use the ballot form to provide written notice to the Association of their decision to resign . . . .

Paradoxically, the cover letter also stated on the same page:

> This authorization may only be revoked by written notice by the undersigned to the Association no less than 90 days prior to the expiration of the current labor agreement between the Association and Union. Upon the giving of such notice to the Association, this authorization will terminate for all purposes.

On July 18, 2000, Nolt voted to accept the terms of the agreement. He gave several reasons for his action at that time: (1) He did not understand the ballot and did not know what it was; (2) He was pressured by Harvey to cast his ballot and he did not have time to consult with an attorney; (3) He thought he could withdraw from the RCA at a later time; and (4) He feared that prematurely withdrawing from the RCA would strain his relationship with the Union.

9

On January 30, 2001, approximately 90 days prior to the expiration of the 1997-2001 RCA Agreement, Nolt advised Harvey that D.A. Nolt was withdrawing from the RCA. McCann then demanded that D.A. Nolt abide by the terms of the 2001-2009 RCA agreement. The Union filed a complaint charging unfair labor practice against D.A. Nolt and a hearing was held before Administrative Law Judge Margaret Kern ("ALJ"). She issued a decision in favor of D.A. Nolt. The Union filed exceptions to the ALJ's decision and the RCA filed an amicus curiae brief in support of the Union's position. In a split decision, the Board reversed the ALJ's decision, holding that she erred in finding that D.A. Nolt lawfully withdrew from the RCA and that D.A. Nolt was bound to the 2001-2009 RCA Agreement. The Board filed an Application for Enforcement of the Order and D.A. Nolt filed a Cross-Petition for Review.

10

II.

In accordance with the Act's fundamental purpose of fostering and maintaining stability of bargaining relationships, an employer or union may not withdraw from a multiemployer bargaining unit after negotiations have begun absent "unusual circumstances" or "mutual consent." Retail Associates, 120 NLRB 388, 395 (1958). Historically, the "unusual circumstances" exception has been limited to extreme situations, as where the employer is subject to extreme financial pressure or where the multiemployer unit has dissipated to the point where the unit is no longer a viable bargaining entity. Bonanno, 454 U.S. at 411.

In Chel LaCort, the Board refused to extend the "unusual circumstances" exception to situations where the multiemployer association fails, either deliberately or otherwise, to inform its employer-members of the start of

11

negotiations. 315 NLRB at 1036. To extend the exception would impose a notice requirement on the multiemployer association and insert the Board into the association/member relationship unnecessarily and with uncertain consequences. Id. at 1037. The Board noted in dicta, however, that there was no evidence of "collusion or conspiracy," stating that "[w]e leave to another case to decide whether or when such evidence would be sufficient to show 'unusual circumstances.'" Id. at 1036 n.5. We now decide that this is a such a case.

In Resort Nursing Home v. NLRB, 389 F.3d 1262 (D.C. Cir. 2004), the court held that there was no collusion or conspiracy when a multiemployer association and union began negotiations for a new agreement eight months prior to the expiration of the old agreement, id. at 1271, and that the Chel La Cort rule is rational and consistent with the Act, id. at

12

1269. There was, however, no evidence that the negotiations were conducted in secret. See id. at 1266-1267.

III.

Although our review of the Board's decision is limited, we conclude that its decision is not rational or consistent with the Act and that the ALJ and dissenting Board Chairman Battista properly determined that "unusual circumstances" justified D.A. Nolt's withdrawal from the 2001-2009 RCA agreement. The Board improperly valued stability over freedom in the context of multiemployer bargaining. See Bonnano, 454 U.S. at 412 ("The Board has recognized the voluntary nature of multiemployer bargaining . . . . At the same time, it has sought to further the utility of multiemployer bargaining as an instrument of labor peace . . . ."). Accordingly, the Board's Application for Enforcement will be

denied and D.A. Nolt's Cross-Petition for Review will be granted.

A.

The Board first concluded that the RCA and Union's conduct did not constitute collusion or conspiracy as contemplated under the <u>Chel La Cort</u> dicta because the effort to have secrecy in the negotiations was directed at the Union's membership, not at D.A. Nolt or other employer-members of the RCA. <u>D.A. Nolt, Inc.</u>, 340 NLRB No. 152, 2003 WL 22970620, at *4 (Dec. 15, 2003). The Board defined "collusion or conspiracy" as "actions by the union and the employer association that are deliberately intended to prevent an employer from exercising its right to withdraw." <u>Id.</u>

We are not satisfied that this restricted definition is rational and consistent with the Act's purpose of maintaining industrial peace. It does not balance freedom in

14

multiemployer negotiations with stability because it impinges upon an employer's freedom to withdraw when it has been intentionally kept in the dark about the negotiation process.

Whether the negotiating groups deliberately intended to prevent D.A. Nolt from exercising its right to withdraw is not as significant as whether the effect of their actions was to prevent D.A. Nolt from exercising its right to withdraw. Board Chairman Battista reasoned in his dissenting opinion:

> My colleagues say that the Union and the employer association did not deliberately intend to prevent the Respondent from withdrawing from the association. However, they deliberately kept them in the dark about the start of negotiations and, under the Retails Associates rule, this interfered with Respondent's right to withdraw from the association prior to the start of negotiations.

D.A. Nolt, Inc., 340 NLRB No. 152, at *9 (Chairman Battista, dissenting).

In accordance with the purpose of the Act, it is not necessary to show that the parties actually agreed to an illegal plan to harm a specific person to prove "conspiracy" or that they specifically intended to defraud a person of his rights to prove "collusion." It is enough to prove that there was a secret agreement that resulted in harm to another. The proximate cause of the harm to D.A. Nolt—the deprivation of his right to withdraw from the multiemployer group prior to the commencement of negotiations—was twofold: (1) the agreement to negotiate in secret (the "conspiracy"); and (2) the actual participation in the secret meetings (the "collusion"). As Chairman Battista emphasized, the harm was not the negotiating committee's stated <u>intention</u>, but the <u>result</u> that irrefragably followed.

Our conclusion encourages unions and bargaining associations to be open and honest in their dealings. To be

sure, it may be counter-productive for negotiating committees to broadcast the substance of offers and counter-offers made during the negotiation process, but no precept of labor management law mandates that negotiating committees keep secret the fact that negotiations have begun when profound deleterious effects may directly result from the secrecy. And here we have such a case. D.A. Nolt was unable to withdraw from the RCA after the start of contract negotiations in accordance with the Retail Associates rule.

We are satisfied that "unusual circumstances" took place here that constituted the proximate cause of injury to D.A. Nolt. The record shows that: (1) the RCA and the Union met secretly to negotiate a new agreement ten months before the expiration of the old agreement; (2) the Union requested that the RCA keep the negotiations secret from its members, including D.A. Nolt; and (3) when Harvey faxed the agreement to the employer-members of the RCA, owners were instructed to stand by their fax machines to receive it so

17

that word would not get out to the employee-members of the Union.

The facts here are distinguishable from those in Resort Nursing Home. Although the multiemployer associations and unions began their negotiations abnormally early in both cases, there was no evidence that the negotiations were kept secret in Resort Nursing Home. See 389 F.3d at 1266-1267 ("On January 9 [the day negotiations began], the Association sent a letter to the Union 'confirm[ing] the intent of the Association . . . to enter into an extension of the current collective bargaining agreements.'"). At any event, the employer in Resort Nursing Home had notice of the ongoing negotiations before an agreement was reached. In contrast, in the case before us, Harvey testified that Union officials specifically requested that the RCA keep the negotiations confidential and there was no proof that D.A. Nolt had knowledge of the secret talks.

18

Accordingly, the NLRB's conclusion that the conduct at issue did not constitute "conspiracy or collusion" is not consistent with the Act because it impinges upon a single employer's freedom to make a timely withdrawal from multiemployer negotiations.

B.

The Board held that "even assuming arguendo that the conduct by the RCA and the Union constituted 'unusual circumstances,' the Respondent by its own conduct forfeited any right to withdraw." D.A. Nolt, Inc., 2003 WL 22970620 at *5. The Board reasoned that D.A. Nolt forfeited its withdrawal right because it waited seven months instead of taking action "promptly after it learned of the new agreement in July 2000." Id. The Board relied on Gary Jasper Enterprises, 287 NLRB 746, 747 (1987), for the proposition that employers are obligated to withdraw as soon as the "unusual circumstances" are evident. Id. The Board also

19

emphasized the fact that Nolt voted to "accept" the 2001-2009 RCA agreement after careful deliberation.

We are not persuaded that the Board's conclusion that D.A. Nolt forfeited its right to withdraw is rational or consistent with the Act. The Board has cited no case to support the suggestion that an employer is obligated to withdraw as soon as "unusual circumstances" become manifest. Gary Gasper Enterprises merely held that an employer acted as "expeditiously as possible" in withdrawing from multiemployer bargaining two weeks after negotiations commenced. 287 NLRB at 747. In that case, the NLRB stated that the timing of withdrawal "must be evaluated in the overall context of the parties' bargaining history." Id.

Here, D.A. Nolt's withdrawal from the RCA seven months after learning of the 2001-2009 RCA agreement was done as "expeditiously as possible" in light of the "overall context of the parties' bargaining history." Because of the express 90 day provision in the cover letter to the 2001-2009

20

RCA Agreement, it was reasonable for Nolt to conclude that he could withdraw within 90 days of the old agreement's expiration.

The Board erred in emphasizing the fact that Nolt voted to "accept" the 2001-2009 RCA Agreement after careful deliberation. This acceptance should not be given controlling effect because of the internal inconsistency in the July 12, 2000 cover letter accompanying the ballot sheet. The cover letter included a provision stating that each employer could withdraw from the RCA until 90 days before the present contract's expiration, i.e., until January 30, 2001. The letter also stated, paradoxically, that if the employer wished to withdraw from the RCA it must do so within two days. Both the Union and the RCA are responsible for this glaring inconsistency. As between those who are responsible for creating this problem (the Union and the RCA) or D.A. Nolt, an innocent party who elected to follow a course explicitly

21

provided for in the RCA's written notification, we conclude

that D.A. Nolt's Cross-Petition for review should be granted.


* * * * *


We agree with the views set forth by the ALJ and

Chairman Battista in his dissenting opinion and reject the

analysis of the Board.

We will grant D.A. Nolt's Cross-Petition for Review

and deny the NLRB's Application for Enforcement.